IN THE UNITED STATES DISTRICT COURT
FOR NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH SNAPCHAT USERNAMES "TYONNA_THEGOAT"; "T_LORRAIN"; AND, "TLORRAINE02", STORED AT PREMISES CONTROLLED BY SNAP, INC. | Case No. 3:24-mj-54<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joel A. Lowry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is in support of an application for a search warrant for information associated with certain Snapchat user IDs that are stored at premises owned, maintained, controlled, or operated by Snap, Inc. ("Snapchat"), a social networking company headquartered in Santa Monica, California. The information to be searched is described in the following paragraphs and in Attachment A and for things described in Attachment B. This affidavit is made in support of an application for a search warrant to require Snapchat to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the users' IDs.

2. I am a Special Agent ("SA") with the Federal Bureau of investigation ("FBI") and have been since October 2021. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the Minneapolis Division, Grand Forks, North Dakota Resident Agency, of the FBI. I am tasked with investigating a number of criminal offenses including the investigation of financial crime, threats to national security, violent crime and

assault within Indian country, crimes against children, and certain activities relating to material involving the sexual exploitation of minors. I have conducted or participated in physical surveillance, interviewing subjects, witnesses, and victims, and the execution of search warrants and arrests. I have received training in the use of search warrants and evidence seizures as they relate to cellular data, and cellular phone location information. My duties include the investigation of violent crimes occurring within Indian country, specifically on the Spirit Lake Reservation, including violations of Title 18, United States Code, Sections 1153 – Offenses Committed Within Indian country; Title 18, United States Code, Section 113(5) – Assault Resulting in Substantial Bodily Injury; North Dakota Century Code, Sections 14-09-22.1 and 12.1-32-01 – Child Neglect; and North Dakota Century Code, Sections 14-09-22 and 12.1-32-01 – Child Abuse (the "**Subject Offenses**").

3. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

4. The information to be searched is described in the following paragraphs and in Attachment A for things described in Attachment B.

5. The statements contained in this affidavit are based on: information provided by other agencies; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from physical searches conducted by law enforcement agents; independent investigation; and my experience, training and background as a Special Agent with the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of

the **Subject Offenses** are located within the following Snapchat accounts: "tyonna_thegoat"; "t_lorrain"; and "tlorraine02" **("User Accounts")**.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the **Subject Offenses** have been committed and that information relevant to the investigation may be maintained in the Snapchat account described below. This includes, but is not limited to, evidence of the identity of the person maintaining the accounts and other social networking accounts associated with the **User Accounts**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## STATUTORY AUTHORITY

7. The legal authority for this search warrant application is derived from Title 18, United States Code, chapter 121, §§ 2701-11, entitled "Stored Wire and Electronic Communications and Transactional Records Access." 18 U.S.C. § 2703(c)(A) allows for nationwide service of process of search warrants for the contents of electronic communications. Pursuant to 18 U.S.C. § 2703, as amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an electronic communication service or a remote computing service to disclose a record or other information pertaining to a subscriber or customer of such service pursuant to a warrant issued using procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

8. On November 22, 2023, D.Y. ("D.Y."), DOB XX-XX-2018, T.Y.1 ("T.Y.1"), DOB XX-XX-2016, T.R.1 ("T.R.1"), DOB XX-XX-2015, and T.Y.2 ("T.Y.2"), DOB XX-XX-

2011 were forensically interviewed by Forensic Interviewer Kori Weigel. I was present during these interviews and watched through video camera footage from another room.

9.  During her interview, D.Y. provided the following information: D.Y.'s mother, REMI LEIGH YANKTON ("REMI"), DOB XX-XX-1987, once came home and "smashed" T.Y.1 on the left elbow with a pan. REMI "smashed" T.Y.1 because REMI believed T.Y.1 turned off the stove while REMI was gone. REMI had been cooking soup. T.Y.1 said she did not turn off the stove, but the stove was turned off so the food would not burn. REMI said the food would not burn and hit T.Y.1. This caused T.Y.1 to bleed from her left arm. D.Y. and T.Y.1 got in the shower to clean off the blood. REMI eventually put a band aid on the injury, and they went to bed. REMI got the pan from the sink. At some point REMI told T.Y.1 to "sleep on the floor." During the interview, D.Y. drew a picture of the "pan" REMI used to strike T.Y.1 with. The picture D.Y. drew is below:



10.  When T.Y.1 was interviewed, she provided the following information:
    a.  REMI hit T.Y.1 with something silver with holes that you stir with. The item was hot because REMI was cooking with it. REMI hit T.Y.1 on the elbow and then on the legs while they were in the living room.
    b.  When T.Y.1 was getting hit, she was laying on the carpet in the living room with her knees pulled up towards her chest and her arms in front of her head. T.Y.1

placed her arms in front of her head in this manner so REMI would not hit her in the face and so T.Y.1 would not get bruises on her face.

c. T.Y.1 was bruised from the event, but it went away.

d. The item REMI hit T.Y.1 with was in the kitchen, in a "white thing," in the sink, where you put silver.

e. REMI told T.Y.1 to lay on the floor with no blanket like a dead animal. REMI then told T.Y.1 to take a shower so "this heals up and nobody knows she did that." D.Y. also got in the shower with T.Y.1.

f. T.Y.1 cleaned the wound with a Q-tip and bacitracin and used a napkin from a roll of napkins in the kitchen to clean up the blood in the shower.

g. REMI told T.Y.1 to put a band aid on her elbow.

h. T.Y.2 told REMI to stop but she did not stop because REMI was kind of drunk. REMI would drink a red "cherry" beverage in a bottle.

i. Blood got on the blue carpet in the living room. REMI cleaned up the blood with alcohol.

j. REMI also hit T.Y.1 with her hands. REMI hit T.Y.1 "everywhere" on the back.

k. One time, REMI hit T.Y.1 on the head when she was six years old. T.Y.1's head hurt and burned. There was no bruise.

l. T.Y.2 was the only other sibling that would get hit.

m. When T.Y.1 was with REMI, T.Y.1 felt "not safe."

n. REMI left T.Y.1, T.R.1, and D.Y. at home alone when T.Y.2 was at practice.

o. During the interview, T.Y.1 drew a picture of the item REMI used to hit her. The drawing can be seen below:

i. 

11. When T.Y.2 was interviewed, she provided the following information:

   a. REMI picked T.Y.2 up from school because REMI did not like T.Y.2 taking the bus. REMI and T.Y.2 went to the store at the marina. REMI started getting angry because she could not find her card and had to pay with money. REMI was kicked out of her apartment because she did not have enough money.

   b. When T.Y.2 and REMI got home, there was a board across the door. REMI took the board off and opened the door. Inside, the stove was turned off. REMI got mad at T.Y.1 for turning off the stove. T.Y.1 started backing away from REMI. REMI told T.Y.1 to "stand right here," and had T.Y.1 stand by the counter and the table in the kitchen. Then REMI started beating T.Y.1 with her hands.

   c. After the beating in the kitchen, REMI told T.Y.1 to go lay on the floor without a blanket or a pillow like a dog. They went to the living room and REMI started beating T.Y.1 with a silver, metal ladle. When T.Y.1 was getting hit with the ladle, she was by the couch in a squatting position, trying to cover herself. REMI warmed the ladle up, so it was hot prior to hitting T.Y.1 with it. REMI did this by letting it sit in the pot. T.Y.2 believed REMI warmed the ladle up on purpose because she was mad. REMI had never done this before. REMI hit T.Y.1 in the head, the arm, the back, and the leg. REMI hit T.Y.1 with the back, curved piece

of the ladle. REMI then dropped the ladle and started kicking and punching T.Y.1 and said, "next time maybe you won't shut the stove off." REMI then picked up the ladle.

d. While getting hit, T.Y.1 was screaming for REMI to stop. D.Y. and T.R.1 were standing by the television in the living room. From the beatings, T.Y.1 got an "egg" on her head about the size of a quarter, and a smaller bruise towards the back of her head about the size of a dime. T.Y.1 was also slapped in the face. When REMI went into the kitchen, there was a red mark from the ladle on T.Y.1's left forearm.

e. T.Y.2 witnessed REMI beat T.Y.1 on the head, on the side by her rib, on her leg, on her stomach, and on her back.

f. The ladle was kept on the counter, by the sink. The ladle was silver and metal. The ladle did not have holes in it.

g. Beatings like that happened about twice a week but were not as bad as the beatings T.Y.2 described.

h. On a different incident, T.Y.2 got beat when she forgot to take out the trash. REMI hit T.Y.2, pulled her hair, and kicked her on the back and in the stomach. T.Y.2 was in the doorway by some boxes. When she got kicked in the stomach or the back, T.Y.2 would feel bad for 30 seconds to 10 minutes. From beatings from REMI, T.Y.2 would get bruises, "eggs", knots in her hair, and sometimes a scratch or cut, like when the hangers break. REMI previously broke a broom on T.Y.2. That broom was located by the refrigerator. REMI would beat her kids with a hanger, a broom, a shoe, a ladle, the board that goes across the door, and a

stick. The board that goes across the door was located by the door. The hangers used were plastic. REMI said she did not use metal hangers because they leave marks.

i. T.Y.2 did not know of any burns that anyone ever got from REMI. T.Y.2 and her sister did get cuts from the broom, the board, and the hanger. T.Y.2, T.Y.1, and T.R.1 had all bleed from the cuts they received. D.Y. got pushed, slapped in the head, and her hair pulled. No one ever needed stiches from the cuts. When there was blood, they would clean it up with napkins. The counter got blood on it before and needed cleaning up. One time, T.Y.2's wood floor, by the dresser, needed blood cleaned off it because REMI punched T.Y.1 and caused her to get a bloody nose.

j. T.Y.2 never told any doctors or the school about any bruises she got from REMI because REMI would just tell them she fell out of a tree or something. T.Y.2 was worried that if she did tell someone, REMI would do it again.

k. T.Y.2's family used to live with her grandma, JOSIE MCKAY ("MCKAY"), but they were kicked out. MCKAY told REMI, "don't make them scream bloody murder, and don't like hit them." REMI would argue with MCKAY and MCKAY

said, "I don't hit … the way you do." MCKAY just grabs by the arm to get them to eat, but she did not pull them by their hair. MCKAY knew REMI beat her kids.

l. T.Y.2 and her siblings had been threatened with a hanger and a flyswatter.

m. T.Y.2 had previously taken photographs of bruises on her phone with the phone's camera.

n. T.Y.2's sister, T.R.2 ("T.R.2"), DOB XX-XX-2006 saved the photographs on her Snapchat. T.R.2's name on Snapchat was "Taylee".

o. T.Y.2 sent photographs of bruises to T.R.2 via Snapchat. T.R.2's Snapchat username was "t_lorrian", T.Y.2's Snapchat username was "tyonna_thegoat", and T.Y.2's Snapchat password was "87171234".

p. T.Y.2's sister took the phone and changed the password. T.Y.2's sister lived at MCKAY's house. The phone belonged to T.Y.2's sister, but she let T.Y.2 use it because she had a newer phone.

q. T.Y.2 believed MCKAY might be glad that her grandkids would not be getting hit anymore.

r. REMI started beating T.Y.2 when she was about six years old. The beatings happened about twice a week. When they lived at Anna's, T.Y.2 was beaten almost every day.

s. REMI drinks alcohol. She drank the banana, the grape, and the mixed berry "99" drink. REMI also drank purple Mikes. When REMI drank, she got mad and forgetful. When REMI left the house, they were left alone for about five hours

and T.Y.2 was left to take care of T.R.1, T.Y.1, D.Y., and one other child. Sometimes REMI dropped T.R.1 off at their grandma's.

12. On November 13, 2023, I received a SFN960 Report of Suspected Child Abuse or Neglect and a video recording from Spirit Lake Social Services. I watched the video. The video appeared to be pointing at the ceiling, but I could hear what sounded like an adult female yelling at a child. Much of the audio was unintelligible but what I could discern from the audio was this: The audio starts with the adult female talking. Then there appears to be a break in the recording and I could hear the adult female yell, "If I thought it was gonna burn, I would have shut it off, don't you think? Don't you fucking think?" I could hear the child crying and say, "Yes." The video cuts over again and I heard the adult female talking and then the child begins screaming, and then the adult female says, "Get your fucking…(unintelligible) and get the fucking…(unintelligible)." The child screams again, and the adult female says, "Get the fucking…(unintelligible), bitch. Get the fucking…(unintelligible), now. And my clean towels are in there and do not play with them. Do not play with my clean towels. You are allowed one. One. You stupid fucking bitch. My soup should have been done. I started it at four, I should have came home…(end of recording)." The child could be heard crying through much of the video. The SFN960 stated that a woman named Brenda Severson received the video on November 8, 2023, at approximately 8:00 PM, from a woman named Youth who said one of her siblings videotaped REMI yelling and screaming at them about the stove off. During T.Y.2's interview, T.Y.2 stated that she was the one to record the video. T.Y.2 said the video was of REMI and T.Y.1. T.Y.2 said she did not record the first altercation with REMI, only the second one. T.Y.2

told the interviewer she normally takes pictures of T.Y.1's bruises when T.Y.1 got beaten, but this time she decided to record the beating. T.Y.2 later sent the video to her sister, T.R.2.

13. During the interview with T.Y.2, Spirit Lake Social Services Director Donalda Charboneau told me she knew T.R.2's Snapchat username to be "Tlorraine02".

14. I was told on January 11, 2024, by Director Charboneau that REMI lived at 3918 72 Ave NE, Ft. Totten, ND 58335, on the Spirit Lake Reservation.

15. On January 11, 2024, Robin Smith from the Spirit Lake Tribal Enrollment office sent me records verifying REMI and T.Y.2 were enrolled in the Spirit Lake Tribe. Smith informed me she did not have any records of REMI's other children.

16. On November 22, 2023, I sent a preservation request to Snapchat for the username "tlorraine02". On November 27, 2023, I sent a preservation request to Snapchat for the usernames "t_lorrain" and "tyonna_thegoat".

17. The dates requested in this warrant are for the Snapchat accounts with the usernames "tlorraine02", "t_lorrain" and "tyonna_thegoat" and for the data between the dates of November 1, 2023, to December 1, 2023, to capture postings from the described incident and past incidents.

## REFERENCED SNAPCHAT ACCOUNT

18. Based on my training and experience, and that of other law enforcement officer's familiar with the Spirit Lake Reservation, Snapchat is used as a means of communication. Snapchat can be accessed through a cellular "smart phone," but unlike telephone calls and text messages made with cellular telephones, which require a data plan, or "minutes," Snapchat allows users to send and receive videos, photos and messages without a data plan as long as an internet, or wi-fi, connection is available. The ability to send and receive these types of calls and

messages make Snapchat a convenient and popular means of communication on the Spirit Lake Reservation.

19.  Snaps are photos or videos taken using the Snapchat application's camera on an individual's mobile device, and may be shared directly with the user's friends, or in a Story (explained below) or Chat. Snap's servers are designed to automatically delete a Snap after it has been opened by all intended recipients. Snap's servers are designed to automatically delete an unopened Snap sent directly to a recipient after 30 days and an unopened Snap in Group Chat after 24 hours.

20.  A user can add Snaps to their "Story." A Story is a collection of Snaps displayed in chronological order. Users can manage their privacy settings so their Story can be viewed by all Snapchatters, their friends, or a custom audience. A user can also submit their Snaps to a crowd-sourced service "Our Story," which enables their Snaps to be viewed by all Snapchatters in Search and Snap Map. Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the Snap, but the user may delete part or all of the Story earlier. Submissions to Our Story may be saved for longer periods of time.

21.  "Memories" is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

22.  A user can type messages, send Snaps, audio notes, and video notes to friends within the Snapchat app using the Chat feature. Snapchat servers are designed to automatically delete one to-one chats once the recipient has opened the message and both the sender and

recipient have left the chat screen, depending on the user's chat settings. Snap's servers are designed to automatically delete unopened one-to-one chats in 30 days. Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not. A user can save a message in Chat by pressing and holding the message. The user can unsave the message by pressing and holding it again. This will delete it from Snap's servers. Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat.

23. If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings.

24. A Snapchat username is a unique identifier associated with a specific Snapchat account which cannot be changed by the user. A Snapchat display name, on the other hand, is not a unique identifier and can be created and changed by a user to indicate how the user will appear within the app. A user can also change a friend's display name to determine how that friend will appear to that particular user on the app, similar to how one can customize contact names on a smartphone.

25. The FBI submitted Snapchat Preservation Requests for **User Accounts,** "tyonna_thegoat", "t_lorrain", and "tlorraine02". These requests were sent to Snapchat on November 22, 2023, for "tlorraine02", and on November 27, 2023, for "tyonna_thegoat" and "t_lorrain". Snap Inc. Law Enforcement Operations confirmed the preservation requests were received and that the accounts associated with **User Accounts** are currently preserved under

Snap Case ID numbers a3591e7090, 24280c1898 and 586c5d7b8b and would be preserved for 90 days.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

26. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Snapchat to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

27. Under 18 U.S.C. §2703(g), a law enforcement officer does not have to be present for either the service or execution of the warrant. It is sufficient for law enforcement to serve it by fax or by mail upon Snap, Inc. I request Snap, Inc., be required to produce the electronic communications and other information identified in Attachments A and B hereto. Because Snapchat, Inc., is not aware of the facts of this investigation, its employees are not able to search for relevant evidence. In addition, requiring Snapchat, Inc., to perform the search would be a burden upon the company. If all Snapchat, Inc. is asked to do is produce all the files associated with the account, an employee can do that easily. Requiring Snapchat, Inc., to search the materials to determine what content is relevant would add to their burden. Because the warrant will be served on Snapchat, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

28. I request the Court authorize law enforcement agents to seize only those items identified in Attachment B from what is produced by Snapchat, Inc., pursuant to the search

warrant. In reviewing these files, I will treat them in the same way as if I were to search a file cabinet for certain documents. Files will be scanned quickly to determine if they are relevant to my search. If they are, they will be reviewed. If your affiant determines they are not relevant, I will put them aside without reviewing them in full. This method is like what a law enforcement officer would do in the search of a filing cabinet or a seized computer.

29. Under 18 U.S.C. § 2703(b)(1)(A), notice to the customer or subscriber is not required when the government obtains the contents of electronic communications using a search warrant.

30. Under 18 U.S.C. §§ 2711(3) and 3127, this Court has the authority to issue the warrant directing Snapchat, Inc., to comply even though Snapchat, Inc., is not located in this district, because the Court has jurisdiction over the offense being investigated.

31. I further request the warrant direct Snapchat, Inc. to produce records and other information pertaining to this account. The government may obtain such records either by filing a motion under 18 U.S.C. §2703(d), or by means of a search warrant under §2703(c)(1)(A).

## CONCLUSION

32. Based upon the information above, I request the Court issue the proposed search warrant as there is probable cause **Subject Offenses** have been committed and evidence of those violations are in or associated with the Snapchat accounts of "tyonna_thegoat", "t_lorrain", and "tlorraine02" (**User Accounts**).

## REQUEST FOR SEALING

33. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for one year – until January 25, 2025. These documents discuss an ongoing criminal investigation that is neither public nor known to

all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Joel A. Lowry
Special Agent
FBI

Subscribed and sworn to before me on January 26, 2024, via telephone.

_____
UNITED STATES MAGISTRATE JUDGE